Barbara J. Forde, #013220
Barbara J. Forde, PLC
20247 N. 86th Street
Scottsdale, AZ  85255
(602) 721-3177
BarbaraJForde@gmail.com
Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MARCUS SILVING and DEBORAH BADER, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICA'S SERVICING COMPANY, a division of WELLS FARGO HOME MORTGAGE; US BANK NATIONAL ASSOCIATION, as Trustee for CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-2, a National Banking Association; FIRST AMERICAN TITLE INSURANCE COMPANY, a California corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware Corporation; CERTIFICATE HOLDERS 1-1000; JOHN AND JANE DOES 1-1000; XYZ CORPORATIONS 1-1000; ABC LIMITED LIABILITY COMPANIES 1-1000; and 123 BANKING ASSOCIATIONS 1-1000,<br><br>Defendants. | No. CV11-0676-PHX-DGC<br><br>**FIRST AMENDED COMPLAINT**<br><br>**FOR WRONGFUL FORECLOSURE; APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS; DECLARATORY JUDGMENT; QUIET TITLE TO PLAINTIFFS; BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING; BREACH OF CONTRACT; NEGLIGENT PERFORMANCE OF UNDERTAKING; FRAUDULENT CONCEALMENT; FRAUD; CONSUMER FRAUD; NEGLIGENCE PER SE**<br><br>**JURY TRIAL DEMANDED** |

COMES NOW Plaintiffs Marcus Silving and Deborah Bader, husband and wife, and for their First Amended Complaint against Defendants, allege as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiffs Marcus Silving and Deborah Bader are husband and wife, and at all material times have resided at 2032 E. Mariposa Grande Street, Phoenix, Arizona,

85024 (the "Property").  They are residents of Maricopa County, Arizona.  This action arises out of a wrongful foreclosure of the Property which occurred on January 11, 2011.

2.     Venue is proper in this Court, as the Property is located within its jurisdiction in Maricopa County, Arizona.  The Property bears parcel No. 212-15-031, is more fully described as:

> LOT 24, MOUNTAINGATE NORTH, ACCORDING TO BOOK 435, OF MAPS, PAGE 13, RECORDS OF MARICOPA COUNTY, ARIZONA. CERTIFICATE OF CORRECTION RECORDED IN DOCUMENT NO. 97-252450 AND DOCUMENT NO. 97-351512.

3.     At all relevant times, Defendant America's Servicing Company ("ASC") is an unknown entity, purported by Wells Fargo Home Mortgage to be a "division" thereof. ASC is not authorized to do business in the State of Arizona and has no filing in this State which identifies its state of residence.  Accordingly, Plaintiffs allege that ASC resides in Arizona.  According to the foreclosure documents regarding the Property, ASC's address is 3476 Stateview Blvd, Bankruptcy MAC # 7801-014, Ft. Mill, South Carolina, 29715. ASC was the servicer of the loan Plaintiffs obtained to purchase the Property.  ASC is also listed as the beneficiary of the Deed of Trust in the Notice of Substitution of Trustee (the "Substitution") and the Notice of Trustee's Sale (the "NTS").  ASC is further listed as the receiving entity for tax statements, on the Trustees Deed Upon Sale.

4.     US Bank National Association ("US Bank"), is the Trustee for the CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-2 (the "Trust").  On information and belief, the loan originator Capital Mortgagebanc, sold the Note to third parties, and the Note allegedly ended up in the Trust; Plaintiffs deny that their Loan is in the Trust. US Bank is a national banking association regulated by the Office of the Comptroller of the Currency ("OCC").

5.     First American Title Insurance Company ("FATICO") is a title insurance company which was allegedly appointed as the trustee under the Deed of Trust ("DOT") through the recording of the Substitution on March 3, 2009, at the Maricopa County Recorder's Office, at Document No. 2009-0202882.   FATICO's principal place of business is Santa Ana, California.

6.     At all relevant times, Defendant Mortgage Electronic Registration Systems, Inc., ("MERS") is a Corporation formed under the laws of the state of Delaware.  MERS is listed as the sole Beneficiary in the DOT, and "is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns."  On information and belief, MERS has no authority to conduct business of any kind in Arizona.

7.     At present, Plaintiffs are unaware of the identity of the Certificate Holders for whom US Bank is Trustee.  If the Certificate Holders are indispensable parties, US Bank must reveal their identities and Plaintiffs will amend the Complaint to add them as defendants.

8.     Plaintiffs are currently unaware of the identity and capacity of JOHN AND JANE DOES 1 through 1000, XYZ CORPORATIONS 1 through 1000, XYZ LIMITED LIABILITY COMPANIES 1 through 1000, and 123 BANKING ASSOCIATIONS 1-1000, but will amend the Complaint when their identities have been ascertained. Plaintiffs allege upon information and belief, however, that each and every presently unknown Defendant is in some manner responsible for the acts or conduct of other Defendants, or were and/or are responsible for the injuries, damages, and harm incurred by Plaintiffs.

## FACTS

9.     On October 17, 2005, Plaintiff Marcus Silving purchased the Property by entering into the Note and DOT (collectively, the "Loan Documents") with Capital Mortgagebanc ("Capital") in the amount of $480,000.00.  The Note states that "[t]he

Lender or anyone who takes this Note by transfer and who is entitled to receive payments under the Note is called the 'Note Holder.'"  The Note states that if the borrowers are in default, "the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me…."  And further, the Note states that "[i]f the Note Holder has required me to pay immediately in full … the Note Holder will have the right to be paid back by me…."  In addition, "[t]he Note Holder may enforce its rights under this Note against each person individually or against all of us together."  And finally, "[i]n addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the 'Security Instrument') … protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note."  An unauthenticated copy of the Note is attached hereto as Exhibit "A."[1]

10.    Capital is listed as the Lender on the DOT, but MERS is listed as nominee for Lender, and MERS is the *only* beneficiary under the Deed of Trust.  In addition, the DOT requires the Lender to give the Trustor 30 days' notice of default before accelerating the loan balance.  The DOT further requires that the Lender give the trustee written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold, before the Trustee may initiate a sale.  The DOT also imposes a duty on the Lender to release the DOT "[u]pon payment of all sums secured by this Security Instrument."  The DOT secures to Lender (1) the repayment of the Loan, and (2) the performance of borrower's covenants and agreements under the DOT and Note.  The term "Lender" is not defined in the Loan Documents.  *See* Deed of Trust, recorded on October 17, 2005, at Doc. No. 20051545641, attached hereto as Exhibit "B."

---

[1]  Plaintiffs are unaware if this is an actual copy of the original Note signed; it certainly does not include copies of allonges or endorsements, and therefore is an incomplete copy.

11.     MERS was created by a group of lenders who sell/trade promissory notes secured by deeds of trust/mortgages.  The purpose for MERS is to save lenders, investors and others who buy and/or sell mortgage loans, the effort and expense of recording an assignment of the deed of trust or mortgage each time the note associated with that deed of trust or mortgage is sold.

12.     Lenders capitalizing on the pooling of mortgages and packaging them for sale, would name MERS as nominee on the deed of trust or mortgage, with MERS as sole beneficiary.  After that, regardless of how many times a note was sold or transferred, the deed of trust/mortgage was not transferred with it.  The deed of trust/mortgage remained in the name of MERS.

13.     On February 1, 2006, Credit Suisse Boston Mortgage Securities Corp. (the "Depositor"), DLJ Mortgage Capital, Inc., as Seller, Wells Fargo Bank N.A., as Servicer, Master Servicer and Trust Administrator, Washington Mutual Mortgage Securities Corp., as Servicer, Bank of America, National Association, as Servicer, Select Portfolio Servicing, Inc. as Servicer and Special Servicer, and U.S. Bank National Association, as Trustee, entered into a Pooling and Servicing Agreement (the "PSA") relating to CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-2 (the "Trust").  The PSA governs the servicing of a pool of loans which were supposed to be placed into the Trust, interests in which were then sold in the form of certificates, to various investors.  The cut-off date pool principal balance for the Trust was $841,682,266.64.

14.     The cut-off date for the Trust was February 1, 2006, the closing date was February 27, 2006.

15.     According to the trustee's sale documents and the trustee's deed signed and recorded in this matter, the Plaintiff's loan is allegedly one of the $841 million in notes pledged into this securitized mortgage pool.

16.     According to the PSA, the Depositor, through the PSA, "sells, transfers, assigns, sets over and otherwise conveys to the Trustee in trust for the benefit of the Certificateholders, without recourse, the Depositor's right, title and interest in and to (a) the Mortgage Loans listed in the Mortgage Loan Schedule…." *See* Section 2.01 of the PSA, excerpts of which are attached hereto as Exhibit "C"; the entirety of the document may be viewed at this Security and Exchange Commission ("SEC") hyperlink: http://www.sec.gov/Archives/edgar/data/1354858/0001162318060 00273/csmc20062poolingandservicing.htm. The Mortgage Loan Schedule is not attached to the PSA, the Exhibits to the PSA, or any other SEC filing. In addition, the PSA filed with the SEC is not signed by any party thereto.

17.     The Depositor allegedly comes into possession of the pool of notes (the "Trust Fund") through the use and implementation of other associated contracts. If Plaintiff's Note was actually a part of this pool, then in this securitization process, the Note should have changed hands multiple times.

18.     In connection with the transfer and assignment of each mortgage loan, the Depositor was to deliver to the Trustee, with respect to each mortgage loan assigned, the original mortgage note bearing all intervening endorsements, and including any riders to the mortgage note, endorsed "Pay to the order of _____, without recourse" and signed in the name of the last endorsee by an authorized officer. *See* Section 2.01, Exhibit "C."

19.     The PSA also specifically provides for security instruments which are in MERS. The parties therefore agreed, that as to MERS designated loans, the notes and deeds of trust would be separated, from the beginning of the Trust. *See* Section 2.01, Exhibit "C."

20.    This information from the PSA contradicts other information regarding Plaintiffs' loan.  This loan was extended by Capital, then, according to paperwork provided to Plaintiffs, it was sold to Ohio Savings Bank.

21.    The loan was written in October of 2005, but this Trust was not created until February of 2006.  Loans which were placed into trusts were normally placed into a trust within weeks of initiation.  A loan would not have been placed into a trust three and one-half months after origination.  In addition, none of the parties to the PSA are entities which had any legal interest in the Loan.

22.    Accordingly, on information and belief, any action taken against the Loan based upon its' purportedly being in the Trust, has been taken without legal authority.

23.    Home loans which are set up with the deed of trust/mortgage going straight to MERS as sole beneficiary, while the note is with the purported lender, separate the note and the deed of trust/mortgage, from the closing date forward.

24.    All parties under the PSA consented to, and agreed on, this separation, and purposely and affirmatively separated the Note from the DOT by leaving the Note with the lender so that the lender could sell the loan into a securitized mortgage pool, while making MERS the only beneficiary under the DOT.

25.    MERS never took possession of the Note.  The Note did not list MERS as a nominee, or a holder, or assignee, of the Note.  The DOT appointed MERS as nominee on the DOT only, and did not give MERS any status related to the Note, or any power to assign or transfer the Note or the debt.  MERS had only bare legal title to the DOT, and no financial interest in the transaction.  The beneficial interest MERS held, related to the DOT only; according to the PSA, the Note was endorsed into the Trust in February of 2006.

///

26.     MERS' only function was to keep the security in its name to save those benefitting from the multi-billion dollar industry of buying and selling of mortgage-backed securities, any recording fees.  MERS is a database of loan information and a repository of deeds of trust.  MERS has saved lenders and others using its services over two billion dollars ($2,000,000,000) since its inception in 1999.

27.     MERS requires those which use MERS' services to be members of MERS. Only those taking specialized training, who are officers of member companies, are authorized to be certifying officers of MERS.

28.     Members of the public, whose deeds of trust/mortgages are in MERS' name, are blocked from access to the database which allegedly contains information about the transfers of their promissory notes, who owns them, and the identity of the investors who may be entitled to payment.  On occasion a MERS inquiry may reveal the identity of an investor, but for many loans, the only information provided is the identity of the servicer; the only information which a borrower already knows.

29.     As of March 5, 2011, nearly two full months after the foreclosure and the alleged "purchase" of the Property by US Bank, the MERS ServicerID System shows the servicer of this Loan as ASC in Minneapolis, Minnesota, and Credit Suisse First Boston LLC in Salt Lake City, Utah, as the investor.  A false phone number is provided for the investor.  A copy of the MERS ServicerID System page pertaining to this Loan is attached hereto as Exhibit "D."

30.     MERS' goal of remaining a document repository for deeds of trust so that loans can be sold over and over without bothering to properly record the transactions, is demonstrated by their own credo, "Process Loans, Not Paperwork."  *See* Exhibit "D."

31.     In April of 2006, Plaintiff Marcus Silving signed a Quit Claim Deed, transferring all his interest in the Property to Plaintiff Deborah Bader, as her sole and separate property.   This Quit Claim Deed was recorded at the Maricopa County

Recorder's Office on April 25, 2006, at Doc. No. 20060546609.  The Quit Claim Deed was signed and recorded at the instance of Axis Mortgage and Investments, a division of the Biltmore Bank of Arizona.  This financial institution loaned Plaintiff Bader $78,000 and took a Deed of Trust against the Property.

32.     As income, property values, and interest rates dropped dramatically in 2008, due to the crash of the real estate market caused in large part by the securitized mortgage market and the underwriting of risky mortgage loans by lenders, Plaintiffs began to have difficulty making their mortgage payment.

33.     In January of 2009, Plaintiffs hired Mr. Michael Hirshtick of National Credit Rescue, to negotiate a loan modification on the Loan.  Mr. Hirshtick contacted the loan servicer, America's Servicing Company ("ASC"), regarding a modification of the Note.

34.     In spite of a pending loan modification package, ASC sent Plaintiff Silving a letter dated January 18, 2009, demanding payment of all past due balances within 30 days, or foreclosure would be initiated.  The day before the 30-day deadline, on February 16, 2009, ASC sent out a letter telling Mr. Silving that he may qualify for certain types of relief, and inviting him to contact ASC.

35.     On February 25, 2009, ASC sent a letter claiming that it did not yet have a financial worksheet with hardship explanation, proof of income, or a hardship explanation.  In fact, ASC had already been provided all these items, and should have already completed review of Plaintiff's package.

36.     In spite of continuing negotiations with the Defendants regarding the Loan, on March 5, 2009, ASC referred the Loan to "outside legal counsel"[2] to initiate foreclosure proceedings.

///

_____

[2]  This is the term used in ASC's response letter to the Attorney General dated February 10, 2011; in fact, the file was sent to FATICO.

37.     On information and belief, neither ASC nor FATICO received a written notification from the Lender of an occurrence of an event of default and of Lender's election to cause the Property to be sold.  This written notice is required, under the DOT, before foreclosure may be initiated.

38.     Even though Plaintiff Silving had a modification package pending, FATICO prepared foreclosure paperwork, including a Notice of Substitution of Trustee (the "Substitution") and a Notice of Trustee's Sale (the "NTS") on March 6, 2009.

39.     The Substitution was signed by Chet Sconyers of FATICO, but his signature identifies him as a Certifying Officer of MERS.   No documents are attached demonstrating his authority to sign as a MERS officer; on information and belief, Mr. Sconyers in fact does not have that authority.  In signing the Substitution, Mr. Sconyers appointed his own company as Trustee under the DOT.  The Substitution is notarized by Cindy R. Moreland, a notary in Tarrant County, Texas, presumably also an employee of FATICO.  The Substitution was recorded in the Maricopa County Recorder's Office on March 6, 2009, at Doc. No. 20090202882.  A copy of the Substitution is attached hereto as Exhibit "E."

40.     Under A.R.S. § 33-804(D), the Substitution must be signed by the beneficiary.  The document is signed by FATICO, claiming to be MERS.  In addition, the text of the Substitution itself states that the beneficiary under the DOT is ASC.  ASC has never been the beneficiary under the DOT.

41.     The NTS was allegedly prepared by FATICO in Fort Worth, Texas, on March 6, 2009.  It is signed by Joe Bueno, claiming to be located in Forth Worth.  However, the notary, Stephanie Ong, claims to have notarized his signature in Orange County, California.

42.     Accordingly, the notarization on the NTS is false, the signature not having been witnessed by Ms. Ong.  The NTS  is void.

43.    Under A.R.S. § 33-808(C)(5), the NTS must contain the name and address of the beneficiary, and the address may not be in care of the trustee.  The NTS prepared and recorded by FATICO, and pursuant to which Defendants foreclosed on Plaintiffs' home, identifies ASC as the beneficiary and provides an address of:  3476 Stateview Blvd., Bankruptcy MAC # 7801-014, Ft. Mill, S.C. 29715.  ASC has never been the beneficiary under the DOT.  All Defendants were fully aware that ASC was not and never had been the beneficiary; this information, placed in the recorded NTS, was knowingly false.  On information and belief, the address given for the beneficiary is not the address for the beneficiary, (whoever that may be); this is the address for Wells Fargo Bank, N.A., which has never been the beneficiary under the DOT.  It is currently unknown what the designation of "Bankruptcy MAC" could mean, or what entity may be in bankruptcy.

44.    Because the Substitution is invalid, the NTS must also be invalid.  Further, the discrepancies regarding the locations of Mr. Bueno and Ms. Ong, indicate that Ms. Ong did not witness Mr. Bueno's signature, rendering the NTS invalid.  Further, failure to provide the actual identity of the beneficiary and the beneficiary's address renders the NTS void.

45.    The NTS was recorded on March 6, 2009, at Doc. No. 20090202883, and bears the very next recording number after that of the Substitution, indicating that the documents were filed at the same time from the same location.  A copy of the NTS is attached hereto as Exhibit "F."

46.    On March 11, 2009, FATICO sent out their package of foreclosure documents to Plaintiffs.  It included a letter stating that "FATICO has been authorized by the Servicer/Creditor to initiate foreclosure proceedings in connection with the deed of trust associated with your real estate loan."  In fact, on information and belief, the **Lender** never notified FATICO in writing of a default on the loan and an election to foreclose on the property, as is required under the DOT.  The package of documents mailed by

FATICO included a cover letter dated March 11, 2009, the Statement of Breach or Non-Performance, the Substitution, and the NTS.  A copy of the March 11, 2009 cover letter and Statement of Breach or Non-Performance are attached hereto as Exhibit "G."

47.     Under A.R.S. § 33-804(C), the beneficiary must send the Substitution by certified or registered mail, to the Trustor.  The beneficiary did not send the Substitution to Plaintiffs.

48.     On March 11, 2009, the Statement of Breach or Non-Performance was signed by DeeAnn Gregory, purporting to be with FATICO and signing as "agent" for U.S. Bank, as Trustee.  Under A.R.S. § 33-809(C), this Statement must be signed by the beneficiary or its agent.  On March 11, MERS was the sole beneficiary under the DOT; accordingly, this Statement of Breach is void and invalid.  US Bank as Trustee was not the actual legal beneficiary under the DOT on March 11, 2009.

49.     On March 12, 2009, ASC sent Plaintiff Silving a letter declining a modification because "[w]e are unable to come to a mutual agreement regarding your request for a workout.  There may be alternative options available based on agency or investor guidelines and approval.  At this time there are no workout options available to you based on your current financial information provided to us."  The letter then invites a telephone call to be considered for additional workout options.

50.     At no time up to March 12, 2009, did ASC tender any proposed agreement regarding a modification.

51.     It was not until April 2, 2009, that an Assignment of Deed of Trust (the "Assignment") was created.  The Assignment purported to be signed by MERS, assigning the DOT to US Bank as Trustee of the Trust.  The Assignment also claims that the Note was transferred from MERS to US Bank.  On information and belief, the Note was never in MERS' possession, to transfer.  The Assignment was signed by Deeann Gregory, claiming to be a Certifying Officer for MERS.  MERS is a Delaware corporation located

in Virginia; Ms. Gregory's signature was notarized in Tarrant County, Texas.  On March 11, this same woman signed the Statement of Breach, claiming to be with FATICO.  The Assignment was recorded on April 3, 2009, at Doc. No. 20090297705.

52.     There is no chain of title or documentary evidence of any kind that shows Plaintiffs' Loan was properly placed into the Trust or that US Bank is the legal beneficiary of the DOT, even if the Loan were in the Trust, or that MERS was in possession of the Note and physically transferred said Note on or around April 2, 2009, when the Assignment was created.  A copy of the Assignment is attached hereto as Exhibit "H."

53.     After Plaintiffs provided further requested documentation in May of 2009, ASC offered a Special Forbearance Agreement, dated July 9, 2009.  The "special" deal being offered was a 3-month trial plan which took only $200 off the existing monthly payment of $3,423.45.  In addition, under the Agreement, a fourth payment of $32,737.18 was due on 10-31-09.  This was no accommodation at all; that payment would have brought the Loan completely current, something the Plaintiff obviously could not do, and a promise upon which he could not perform.  Because this offer was not acceptable, Plaintiff Silving did not sign or accept it.

54.     ASC claimed in its response letter to the Arizona Attorney General that the final payment of $32,737.18 was " not an installment due under the forbearance."  To the contrary, that amount is clearly listed as the final payment due on October 31, 2009, and the Agreement, states that "[i]f any payment is not received on or before the due date, the agreement will be void…."  The letter further states, "[i]n the event the total amount due of each payment is not received, the Special Forbearance agreement will be rendered null and void."  *See* letter from ASC dated July 9, 2009, attached hereto as Exhibit "I."

55.     On August 6, 2009, ASC sent a letter stating that the "Repayment Agreement" has been denied because Plaintiff failed to adhere to the agreed upon terms of

the forbearance plan.  The letter stated that the borrower had failed to make a scheduled payment.  In fact, Plaintiff Silving never agreed to the forbearance plan at all.  The letter contained the same statements as before, regarding "alternative options available," then stated that there are no workout options available, and then encouraged the borrower to call for workout options.  *See* letter from ASC dated August 6, 2009, attached hereto as Exhibit "J."

56.    On September 16, 2009, ASC sent another Special Forbearance Agreement, after receiving more information from the Plaintiffs.  This time, the payment was $225 less than the actual current payment of $3,423.45, and the final payment under the "special" agreement was a balloon in the amount of $43,285.64 due on January 16, 2010. Again, the Agreement confirmed twice that all payments were due when stated, with no grace period, and "[i]f any installment is not received on or before the respective due date, the Agreement will be void…."  The letter further states, "[i]n the event the total amount due [for each installment] is not received, the Agreement will be rendered null and void." *See* letter from ASC dated September 16, 2009, attached hereto as Exhibit "K."

57.    Again, Plaintiff Silving did not agree to the "special" agreement; the payment was not lowered sufficiently, the proposal did not comply with applicable guidelines, and Plaintiff was unable to make the final balloon payment required.

58.    On October 28, 2009, ASC sent a letter stating that the request for a "Repayment Agreement" has been denied because Plaintiff failed to adhere to the agreed upon terms of the forbearance plan.   In fact, Plaintiff Silving never agreed to the forbearance plan at all.  The letter contained the same statements as before, stating that there are no workout options available, and then encouraging the borrower to call for workout options.  *See* letter from ASC dated October 28, 2009, attached hereto as Exhibit "L."

///

59.     Plaintiffs again sent information to ASC, which it took ASC 30 days to review.  On January 5, 2010, another Special Forbearance Agreement was presented, this one for only $97 less per month than the actual mortgage payment of $3,423.45.  This "special" forbearance made no promise of a modification if the four proposed payments were made, and waived no rights under the pending foreclosure.  *See* letter from ASC dated January 5, 2010, attached hereto as Exhibit "M."

60.     Because the proposal gave no relief in the form of payment amount, and the "lender is under no obligation to enter into any further agreement", after taking the $13,307 in payments, Plaintiff Silving declined to enter into the agreement.

61.     ASC notified Mr. Silving by letter dated February 11, 2010, that he was declined for the plan because he failed to adhere to the agreed upon terms.  Again, Plaintiff Silving had not agreed to any terms, so the letter was false and nonsensical.  The letter added that "other alternatives" may be available, and encouraged Plaintiff to contact ASC to investigate workout options.  *See* letter from ASC dated February 11, 2010, attached hereto as Exhibit "N."

62.     From March through June of 2010, Plaintiff Silving continued to work with ASC to try to obtain a fair modification complying with modification guidelines of a payment in the range of 30% of demonstrated income.  ASC continued to request documents and information which was already in its possession, or had become stale strictly due to its failure to act in a timely manner and/or its failure to offer a reasonable loan modification pursuant to applicable guidelines, in a timely manner.  ASC ultimately declined to offer a modification by letter dated June 29, 2010, claiming that not all information requested had been received as required "per your trial modification period workout plan."  Plaintiff was not in a workout plan with ASC.  In addition, ASC's claim of a lack of information was false; Plaintiff Silving had provided all requested information in a timely manner.

63.     On July 13, 2010, Plaintiffs' agent telephoned ASC to investigate whether there were any further options for a modification.  ASC sent out a letter documenting that call.  Even though ASC had just spoken with Plaintiffs' agent and should have provided Plaintiff's agent information regarding options during that call, their letter told Mr. Silving to call them "as soon as possible to discuss these options."  According to the letter, "[o]ur primary goal is helping you to continue to experience the pride of home ownership."  *See* letter from ASC dated July 13, 2010, attached hereto as Exhibit "O."

64.     ASC continued to play documentation games with the Plaintiffs from August of 2010 through January of 2011.  Plaintiffs provided every piece of documentation requested in a timely manner.  ASC continued to lead the Plaintiffs to believe that a modification was being considered in good faith.  However, if ASC did not receive a document requested immediately, or could not reach Mr. Hirshtick immediately, it would send out a rejection of the modification application, stating, "you did not provide us with all of the information needed within the time frame required per your trial modification period workout plan."  Again, Plaintiffs were never in a workout plan with ASC.

65.     ASC engages in the practice of leading borrowers to believe that they will receive a modification, negligently and or intentionally misusing their modification program, improperly using form letters which do not even apply, and making arbitrary decisions on pending applications without any good faith basis, including "closing" a modification file simply because a requested document was not immediately received.

66.     All of ASC's actions pertaining to real property in the State of Arizona are void, as ASC has no authority to conduct business of any kind in this State.

67.     In a letter dated February 10, 2011, to the Arizona Attorney General, ASC admits that it refused to postpone the foreclosure sale while a modification package was pending, simply because it had already postponed the sale numerous times and the loan

was 26 months past due.  This delay was due to the negligence and/or intentional conduct of ASC/US Bank.  Plaintiffs contacted the Defendants promptly when they realized they would have difficulty making their mortgage payment, within a month or two of the initial default.  Plaintiffs promptly applied for a modification in order to fully engage the process, and resolve the matter, as expeditiously as possible.  The delay in resolving the Plaintiffs' Loan was wholly due to the negligent and intentional conduct of ASC and the investors it was supposedly conferring with, including US Bank as Trustee; 24 months after applying, there was still no resolution.

68.    The Defendants conducted the trustee's sale on January 11, 2011.

69.    Had Plaintiffs been aware that the Defendants would arbitrarily proceed with the foreclosure sale on January 11, 2011, they would have sought other assistance, options, or legal measures to prevent foreclosure.  During the pendency of the modification process, Defendants had always agreed to postpone the foreclosure sale, up to this time.[3]  Plaintiffs reasonably believed that they would postpone again, due to the pending modification, and according to the course of dealing between the parties.

70.    The Trustee's Deed Upon Sale, recorded on January 24, 2011, claims that the trustee's sale occurred on January 11, 2011, when the Grantee, defined as US Bank National Association, as Trustee for CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-2, purchased the Property by "being the highest bidder at such sale" and "made payment therefore [sic] to said trustee the amount bid, namely, $246,500.00."  The sale was conducted by FATICO under color of title of Substitute Trustee under the Deed of Trust.  The Trustee's Deed was allegedly signed by Robert Bourne, identified as "Trustee Officer," for FATICO, on January 19, 2011.  The signature is notarized by Alfonso Perez, in Tarrant County, Texas.  The Trustee's Deed was recorded at the Maricopa County Recorder's Office on January 24, 2011, at Doc. No. 2011-0065809.  A

---

[3]  ASC asserts in its response letter to the Arizona Attorney General dated February 10, 2011, that it postponed the sale 16 times.

copy of the Trustee's Deed Upon Sale is attached hereto as Exhibit "P."

71.     Under A.R.S. § 33-811(B), the price bid had to be paid to the trustee by 5:00 p.m. of the day after the sale date, or in this instance, 5 p.m. on January 12, 2011.  The Trustee's Deed states that US Bank paid the trustee the amount bid.  On information and belief, US Bank as Grantee did not pay $246,500.00 to the Trustee; accordingly under the statute, if there were no other bidders the sale should have been deemed reset for 28 days later, or to February 8.  On information and belief, no sale took place on February 8.

72.     Because of the numerous defects with the foreclosure sale documents, the Trustee's Deed, and the bidder's failure to pay the bid price, the Trustee's Sale is irreparably defective and must be unwound.

73.     Pursuant to A.R.S. § 33-811(A), at a subsequent sale date, the Trustee "shall reject" the bid from any previous bidder who did not pay that bidder's bid price.  The Trustee must, therefore, reject any bid from US Bank at any subsequent sale date.

74.     Attachment 1 to the Trustee's Deed demonstrates that the Trustee's Deed is void.  The Deed claims that US Bank is the Grantee, but on the attachment, the Grantee is not listed except for "c/o America's Servicing Company," and the Grantee's address given is for Wells Fargo Bank, N.A.

75.     The Trustee's Deed is further defective for failure to comply with A.R.S. § 33-401(C) which requires that the Grantee's name and address be set forth.  In place of Grantee's name, Charisse Avery, an individual of unknown authority, put "c/o America's Servicing Company."

76.     On information and belief, the Defendant ASC and the unknown investors and on information and belief, US Bank as Trustee, have a policy and/or practice of:  1) luring borrowers into continuing default and refusing to accept payments after said default while they negligently administer their loan modification program in such a dilatory manner that the borrowers are too far in default to reinstate when the Defendants finally

decline to provide a viable loan modification; 2) leading borrowers to believe that once in default, they will qualify for and be given a loan modification, knowing that these representations are false and/or negligently made; 3) waiting for the borrower to be so far in arrears due to the borrower's reliance and belief that Defendants will stand by their word and act in good faith, that it is impossible for the borrower to come current; 4) placing the loan into foreclosure while a modification package is pending, all the while assuring the borrower that Defendants will continue to work with them in spite of the impending sale, knowing that this representation is false and/or negligently made; 5) ASC's considering its own interests as servicer of the loan above the interests of the borrower or the investor(s), 6) continuing, even after a trustee's sale is noticed, to lead the borrower to believe that Defendants want to work with Plaintiffs through a modification by soliciting, accepting, and allegedly considering modification packages, and telling Plaintiffs, even in declination letters, that there are other workout options available, knowing that the Plaintiffs will rely on these representations which are false and/or negligently made; 7) postponing the trustee's sale only 30 days at a time, then arbitrarily refusing to move the sale while a modification package is pending and Plaintiffs have provided all information requested; 8) proceeding on a foreclosure without standing to do so based on, including but not limited to: (a) violation of the PSA which required the placement of the Note and DOT into the Trust on or before the Trust closed in February of 2006; (b) the separation of the note and deed of trust from loan inception; (c) the inability to prove status as the Note Holder, as under the Note terms, only the Note Holder is entitled to payment; (d) a complete lack of evidence that the Loan was placed into this Trust at all, or had any relation to any of the entities related to the Trust; (e) the inability to determine the identity of the beneficiary, the Note Holder or the lender/creditor; and 9) knowingly proceeding with a trustee's sale on false documents which are signed by unauthorized individuals and entities, improperly notarized, set forth false information

about the beneficiary, and clearly show that the location of the Note, the identity of the beneficiary, the identity of the Note Holder, and the identity of the Lender, are all *unknown* under the contracts and applicable legal principles.

77.   On information and belief, FATICO has a policy and/or practice of:   1) creating, signing and recording foreclosure documents claiming authority as other entities, without actual authority to do so, leading trustors to reasonably believe that the documents are accurate and made according to and pursuant to the law, 2) failing to obtain a written declaration of default from the Lender instructing FATICO to foreclose, before initiating foreclosure; 3) failing to comply with the applicable statutes regarding the preparation of foreclosure documents, and the notices required; 4) creating and recording an assignment which claims, without any legal basis, to transfer not only the Deed of Trust by assignment, but also the Note, knowing in this instance that the Note was not transferred to MERS, and knowing that the proper method for transfer of a note is not by assignment, but by endorsement or allonge, but purposely misrepresenting the true facts regarding Note transfer; 5) proceeding without knowing the true identity of the legal beneficiary, Note Holder and lender/creditor; 6) issuing a NTS based on a defective and void Substitution, claiming that ASC is the beneficiary under the DOT in both documents, knowing that this representation was in fact false; all with the goal of taking Plaintiffs' house, knowing that the documents do not comply with the law.

78.   On information and belief, MERS has a policy and/or practice of:   1) allowing lenders to purportedly place deeds of trust related to loans in the MERS database, thereby allowing financial institutions to circumvent county requirements for recording documents which recording system is in place to be able to trace a clear chain of title on real property within their jurisdictions; 2) participating in a system of loan processing and documentation whereby the note and deed of trust are separated when the deed of trust is placed with MERS, while the note is endorsed to another entity; 3)

creating and taking part in a system of loan processing and documentation which allows the identity of the investor or lender on a loan to remain hidden from the borrower, so that the borrower has no way to determine the identity of the beneficiary, Note Holder, or lender/creditor on the loan; and 5) allowing individuals working for foreclosure mills, document processing companies, banks, and anyone else who desires to conduct foreclosures, to sign as though they are employees of MERS, without enforcing MERS' own guidelines regarding training to be "Certifying Officers," and without requiring the disclosure by these individuals of their true identity and under what authority they are signing on behalf of MERS.

79.    Plaintiffs have been provided information indicating that Defendants do not know who is in possession of the Note, and Plaintiffs now doubt that the original Note exists any longer.   ASC and US Bank claim that the Note is in the Trust, but the Assignment was just signed and recorded in April of 2009, which purports to transfer both the DOT and the Note to US Bank, more than *three years* after the deadline for doing so. The Note may still exist, or have been destroyed.  It likely was scanned into electronic format and shredded shortly after loan inception, or it may be in the possession of Capital, US Bank as Trustee, ASC, or some intervening note purchaser such as the Depositor[4], or, according to Defendants, MERS.

80.    The identity of the true creditor, if any, is unknown; if the Note is found to have been legally and timely transferred to the Trustee, the mortgage pool contains hundreds or thousands of investors, all with a legal claim to a portion of the Note.   In addition, due to the default on the Note, it has either been transferred out of the Trust pursuant to a credit default swap or under the terms of the PSA, or otherwise been paid

///

---

[4]   As indicated in ¶ 29 and shown in Exhibit "D," MERS' records show the investor as Credit Suisse First Boston LLC; no loan documents, foreclosure documents or recorded documents reflect this entity as having any interest in the Loan.

through insurance taken out by parties in interest, government sponsored enterprises, or other programs, received by entities claiming to be the creditor and/or Note Holder.

81.   The location of the Note, who is the Note Holder, the beneficiary, and the Lender, is further called into question after the trustee's sale.  The Substitution and the NTS both claimed that ASC was the beneficiary, but it never has been.  A telephone call to the Wells Fargo office of the President on March 7, 2011, revealed that the Defendants still are unaware of the true legal standing of the parties, if any legal standing they have. Mr. Alfonso Mata in the Wells Fargo offices stated that he was unaware of any involvement that US Bank might have with this loan or foreclosure, yet according to the documents prepared, US Bank appeared at the trustee's sale on January 11, 2011, and paid $246,000.00 cash for the Property.

82.   According to the Trustee's Deed upon Sale, Wells Fargo has no ownership interest in the Property, a fact of which they seem completely unaware.  Rather, it appears that ASC continues in some unknown capacity, as it is listed as the entity to receive tax statements, on the Trustee's Deed.  Notably, the Defendants continue in their campaign to conceal the identity of true parties in interest, by filing the notice required by A.R.S. § 33-401(C) but failing to set forth the Grantee's name and address, instead again filling in that of ASC.  ASC is not the Grantee.

83.   If any of these Defendants are allowed to enforce the Note without producing the original with all endorsements and allonges, and proof that that particular Defendant is entitled to enforce the Note and receive payment, as required by the clear terms of the Note, Plaintiffs will have had their home taken from them without legal basis.

///

///

///

///

**COUNT ONE**
**DECLARATORY JUDGMENT TO VOID TRUSTEE'S DEED UPON SALE,**
**RESCIND TRUSTEE'S SALE, VACATE SUBSTITUTION OF TRUSTEE,**
**ASSIGNMENT OF DEED OF TRUST, AND NOTICE OF TRUSTEE'S SALE**
**(ALL DEFENDANTS)**

84.     Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

85.     A trustee's deed raises the presumption of compliance with the requirements of the deed of trust and the applicable statutes.  However, a trustee's deed is conclusive evidence of the meeting of those requirements **only** in favor of a purchaser or encumbrancer for value and without actual notice of any irregularities.  A.R.S. § 33-811(B).

86.     The Grantee on the Trustee's Deed, US Bank as Trustee, "purchased" the Property.  However, on information and belief, US Bank did not pay any funds pursuant to the trustee's sale on January 11, 2011.  US Bank claims that it is acting as the trustee of the Trust, which is allegedly the lender on the Property.  US Bank knew or should have known that the loan was never properly placed into the Trust, and that the documents created, signed, recorded, and upon which the trustee's sale was conducted, do not comply with applicable law and are void.  The Grantee is not a purchaser for value and without actual notice.

87.     A foreclosure sale is void if there are grounds for equitable relief based on serious sale defects, including deliberate notice failure, fraud, misrepresentation, or concealment.

88.     The DOT signed by Plaintiffs shows MERS as the sole beneficiary, and states MERS is "acting solely as a nominee for [Capital]…."

89.     The Substitution is void because it is signed by Chet Sconyers of FATICO, claiming to be a Certifying Officer of MERS.   No documentation is attached

demonstrating this authority; the Substitution is therefore an incomplete instrument.  In addition, the beneficiary identified on the Substitution is ASC; ASC has never been the beneficiary.  At the time this document was signed, the sole beneficiary was MERS.  The Substitution is void.

90.    The Notice is also void, as it purports to be signed by Joe Bueno of FATICO in Texas, but notarized by Stephanie Ong, in California.  Further, the Notice identifies ASC as the beneficiary when it is not; all Defendants knew this fact and yet knowingly signed and recorded the NTS with this false information.  The statute requiring the designation of the beneficiary, was thereby violated.

91.    The Assignment purports to assign not only the DOT, but also the Note, from MERS to US Bank.  MERS never had possession of the Note or authority to transfer or endorse it; as a nominee and bare legal title holder, MERS had no ability to assign the Note.  The Assignment was signed by Deeann Gregory, who claims to be a Certifying Officer of MERS, and on the same day on the same loan, signed the Statement of Breach or Non-Performance, claiming to be with FATICO.

92.    The Assignment of the DOT from MERS to US Bank as Trustee, was signed by an individual of unknown employment status, Deeann Gregory.  She purports to be signing as Certifying Officer of MERS, but MERS has no employees which perform these functions.  Ms. Gregory has not been properly authorized to be a Certifying Officer of MERS.

93.    The Assignment is void for lack of an authorized signature and for purporting to assign interest in a Note, which the assignor had no authority to assign, and no legal relation to the debt which would make such an assignment effective.  Any attempt to transfer the Note from MERS to US Bank, as Trustee, under the Assignment, is of no force and effect.

94.    Any attempt to assign the beneficial interest in the DOT to another, without simultaneously being the holder of the Note, is void.

95.    MERS has no authority to assign the DOT.

96.    The Note and DOT were separated at loan inception; the DOT stayed with MERS, while the debt and Note were endorsed into the Trust, or sold to Ohio Savings.

97.    No Defendant has been both the Note Holder and the beneficiary of the DOT simultaneously.

98.    If the Note was not transferred into the Trust on or before February 27, 2006, it never became Trust property.  Accordingly, any purported action by the US Bank as the Trustee of the Trust regarding the Note, is void.

99.    The Assignment of the DOT from MERS to US Bank as Trustee is void.

100.    Because the Substitution, NTS and Assignment are void, the sale and resulting Trustee's Deed are also void and the sale must be rescinded.

101.    Defendants' actions, in continuing to accept supplemental information from the Plaintiffs pursuant to efforts to modify the Loan, in sending multiple proposals for modification and each time postponing the foreclosure based on pending negotiations, in opening, closing, and opening the negotiation file over and over as a regular business practice, were all purposeful actions taken to mislead and conceal the truth, that Defendants fully intended to foreclose while simultaneously appearing to be working with the Plaintiffs.

102.    Defendants' course of conduct detailed in this Verified Complaint, which includes breach of contract, misrepresentation, concealment, and fraud, all caused the loss of Plaintiffs' Property.

103.    All Defendants have breached their obligations as set forth in, among other laws, Arizona statutes relating to foreclosures; Defendants have also breached their obligations and duties to the Plaintiffs pursuant to the contracts between the parties and

common law, by allowing their agents/employees to sign documents without legal authority, and proceeding with foreclosure without written instruction from the Lender to do so, thereby initiating a trustee's sale, and foreclosing on the Property, without legal authority.

104.   As detailed above, the NTS, Assignment, and Substitution are all defective, unenforceable, and void, based on lack of authority, breach of contract, lack of standing, concealment, and fraud.

105.   Accordingly, the trustee's sale itself, and the resulting Trustee's Deed, are also void.

106.   As the trustee's sale proceeded without legal authority, the sale which took place on January 11, 2011, must be rescinded, the Trustee's Deed recorded on January 24, 2011, voided, and the Property restored to the Plaintiffs.

107.   Plaintiffs are entitled to their attorney's fees and costs arising out of this claim, pursuant to the contracts between the parties and A.R.S. § 12.341.01.

**COUNT TWO**

**QUIET TITLE**
**(ASC, US BANK, FATICO, MERS)**

108.   Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

109.   A quiet title action may be brought after a trustee's sale has taken place.

110.   At the time the loan closed on October 17, 2005, and thereafter, the Note gave Capital the right to payments.

111.   Plaintiffs have been given conflicting information about the identity of the Note Holder.  The Note may have been scanned and shredded, held by Capital, endorsed through multiple parties and ultimately into the Trust, or according to the Assignment,

held by MERS and allegedly transferred to US Bank on April 2, 2009.  MERS' database shows that Credit Suisse First Boston, LLC, is the investor.

112.   Plaintiffs have no knowledge of, and no way to determine, who the legal Note Holder is, who is entitled to payments, and whether the Note still exists.

113.   Only the Note Holder which also holds the DOT in its name, without separation of the two, may enforce the security and foreclose on the Property.

114.   Plaintiff Marcus Silving quit-claimed his interest in the Property to Deborah Bader in April of 2006.

115.   At the time the loan closed on October 17, 2005, MERS was the sole beneficiary under the DOT.  MERS remained the sole beneficiary until April 2, 2009. The Deed of Trust was entered on the MERS system with MIN # 1001625-0005432615-3.

116.   The DOT says that MERS acts solely as nominee for Lender.  There is no express grant of any right to MERS to transfer or sell the Note under the DOT or the Note. MERS has no authority to assign its duties as a nominee, nor does MERS obtain any right to Plaintiffs' payments or to serve in the role of receiving or servicing the Note payments.

117.   The Assignment recorded on April 3, 2009, which purports to assign the DOT and the Note from MERS to US Bank as Trustee under the signature of Deeann Gregory, is void.  The Assignment as it relates to the Deed of Trust is void because Ms. Gregory, an unknown employee for an undesignated company, is on information and belief, not a legally appointed Certifying Officer of MERS, and because MERS has no authority to assign the DOT.  The Assignment as it relates to the Note is void because MERS, as nominee and bare legal title holder, never had an interest in the Note to assign, it does not have the authority to assign the Note, Notes are not legally transferred by way of an assignment, and under the PSA, the Note was endorsed over to the Trust in February of 2006.

118.   A note and deed of trust are inseparable.  If a note and deed of trust are

separated, in that the holder of the note and the beneficiary of the deed of trust are not the same individual or entity, the note becomes unsecured.

119.    Upon closing in October of 2005, the holder of the Note was Capital.  The beneficiary of the DOT was MERS, and the trustee was Grand Canyon Title Agency.  The Note and DOT have been separated since the inception of this loan.

120.    The assignment of a deed of trust without a legal transfer of the debt, transfers nothing.

121.    All Defendants specifically consented to the separation of the Note and DOT from loan inception, as is demonstrated by the loan documents themselves, as well as the PSA.  In February of 2006, according to the PSA, the Note was endorsed to the Trust and the debt and Note were transferred into the Trust.  MERS kept the DOT.

122.    The Assignment of the DOT is invalid.  There has been no evidence to show that Capital had given authority for MERS to assign it; further, the purported Assignment is signed by an unknown employee of an unknown Texas entity.  In addition, the DOT is a nullity.  Having been consensually separated from the debt in October of 2005, the DOT secures nothing.

123.    The Assignment of the DOT was without the debt; the transfer was a nullity.

124.    The MERS Assignment of the Note is invalid; MERS is not the holder of the Note, an assignment is not the proper method for transfer of a note, and the purported Assignment is signed by an employee of an unknown Texas entity.  On information and belief, this unknown Texas entity is not now and never has been the Note Holder.

125.    Defendants foreclosed on the Property, purportedly as the party with standing to enforce the Note and DOT.  The Note having been unsecured since the date of loan closing, October 17, 2005, no Defendant had legal authority to foreclose pursuant to the Deed of Trust.  The Assignment of the DOT was a transfer of nothing.

126.    No Defendant had standing to pursue foreclosure, as no one Defendant was

both the beneficiary of the DOT and also the Note Holder. The chain of title to the Property is broken.

127. On information and belief, no party will be able to provide genuine evidence that it was in legal possession of the Note with entitlement to enforce it through foreclosure or otherwise.

128. Various defendants have filed documents against the Property, without the legal authority to do so. Those documents include, but are not limited to, the Substitution, the Assignment, the NTS, and the Trustee's Deed.

129. Plaintiff Deborah Bader's and/or Marcus Silving's interest in the Property is superior to the interest of any Defendant.

130. Plaintiffs are entitled to an order from this Court that the Plaintiffs' estate in the Property be established in them, that title be quieted in their names, that the illegal Trustee's Sale be rescinded, and that all illegally recorded documents including the Trustee's Deed, be declared null and void with filings at the Maricopa County Recorder's Office to that effect, and that all Defendants be barred and forever estopped from having or claiming any right or title to the Property, adverse to Plaintiffs, and that the Deed of Trust be declared void and of no force and effect, and be released by a recording at the Maricopa County Recorder's Office.

## COUNT THREE

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
#### (ALL DEFENDANTS)

131. Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

132. Defendants are obligated under the Note and DOT, the Substitution, the Assignment, the NTS, and the common law, to act in good faith and to deal fairly with Plaintiffs.

133.   The purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.

134.   The duty of good faith extends beyond the written words of the contracts.

135.   When a party or parties to a contract manipulate bargaining power to its/their own advantage, injuring the other party, the party/parties with bargaining power breach its/their duty of good faith.

136.   Plaintiffs reasonably expected that the Defendants would use good faith and deal fairly in initiating and proceeding with foreclosure.

137.   Defendants and/or their agents breached their duty of good faith and fair dealing by:

a.     hiding the identity of the true beneficiary, lender/creditor, Note Holder, and party entitled to payment from Plaintiffs;

b.     failing to follow through on contractual obligations, including without limitation allowing an entity, not the Note Holder, to enforce payment and seek foreclosure;

c.     foreclosing in direct contravention of contract terms;

d.     proceeding to trustee's sale on clearly faulty documents, i.e., the Substitution, NTS, and Assignment, as fully set forth in detail above.;

e.     foreclosing in violation of the deed of trust statutes, which are a part of every deed of trust.

138.   As a result of these failures to act in good faith and the absence of fair dealing, Defendants have caused Plaintiffs harm, in the amount of, at a minimum, the balance due on the Note, and attorney's fees and costs incurred.

139.   As this claim arises out of the contracts between the parties, Plaintiffs are entitled to their attorney's fees and costs incurred in having to bring this claim, pursuant to the terms of the contracts as well as A.R.S. § 12-341.01.

**COUNT FOUR**

**BREACH OF CONTRACT**
**(ALL DEFENDANTS)**

140.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

141.    Defendants, as a beneficiary, a servicer, a trustee, or as an alleged successor or assign of a party to the Note and/or Deed of Trust, are all bound in contractual privity with Plaintiffs.

142.    In pursuing a trustee's sale in violation of the terms of the Note and DOT, as set forth in detail above and in violation of applicable statutes and law, which are a part of every contract, the Defendants have breached their contracts with the Plaintiffs.

143.    In pursuing a trustee's sale in violation of the contracts and applicable law, Defendants breached the duty of good faith and fair dealing implied in every contract.

144.    In voluntarily, but negligently, undertaking to modify Plaintiffs' loan, ASC and US Bank breached the duty of good faith and fair dealing implied in every contract.

145.    As a result of the Defendants' breaches of contract, Plaintiffs have suffered damages in the form of attorney's fees, costs, late charges, accruing interest, damage to credit, a 2-year delay in principal pay-down, and other damage.

146.    As this matter arises out of contract, Plaintiffs are entitled to their attorney's fees and costs pursuant to the contracts and pursuant to A.R.S. § 12-341.01.

///

///

**COUNT FIVE**

**NEGLIGENT PERFORMANCE OF UNDERTAKING
(GOOD SAMARITAN DOCTRINE)**
**(ASC, US BANK)**

147.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

150.    Defendants voluntarily put in place, a loan modification program and Special Forbearance program available to their borrowers.  Borrowers experiencing problems paying their mortgage were encouraged, even urged, to submit a modification package.

151.    Pursuant to Defendants' program, Defendants undertook to modify Plaintiffs' loan.  Defendants sent correspondence, and had many conversations with Plaintiffs' agent, in which Defendants encouraged Plaintiffs to submit a modification package, and enter into Special Forbearance.  Defendants routinely and as a matter of course, postponed the foreclosure sale during this period of negotiation.

152.    During this modification time period, Plaintiffs were unable to resolve their default, pay down their principal, or avoid decimating their credit.

153.    In spite of promises to help Plaintiffs, Defendants did not have adequate staffing or resources, to administer its own loan modification and Special Forbearance program.

154.    Defendants failed to employ adequate and competent staff, and failed to provide Plaintiffs with accurate and appropriate methods for contacting Defendants for information and to submit requested documents and information.

155.    Defendants routinely demanded information already in their files.

156.    Defendants made inaccurate calculations and determinations of Plaintiffs' eligibility for loan modification programs, proposed Special Forbearance plans which

provided no monetary relief to the Plaintiffs and which required massive balloon payments at the end of a 4-month period, along with making no promise of any kind that the Loan would be modified at the end of the payment plan.

157.   Defendants failed to follow through on written, verbal and implied promises, including without limitation the promise that their "***primary goal*** is helping you to continue to experience the pride of home ownership." *See* Exhibit "O" (emphasis supplied).

158.   Defendants engaged in dilatory tactics, resulting in Plaintiffs' not being aware, until less than 24 hours before the sale, that the Defendants were conducting the trustee's sale on January 11, 2011.

159.   Plaintiffs relied on the Defendants to administer the loan modification program, and Special Forbearance program, in a timely manner and with due care.

160.   Defendants' negligence in administering its' programs resulted in economic harm to the Plaintiffs, including but not limited to, the foreclosure of the Property, loss of equity, a 2-year delay in principal reduction payments, and damage to their credit rating.

161.   Plaintiffs are entitled to damages from the Defendants as a result of their negligent administration of their loan modification program and Special Forbearance program.

## COUNT SIX

## FRAUDULENT CONCEALMENT
### (ALL DEFENDANTS)

162.   Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

163.   Defendants invited Plaintiffs to submit multiple loan modification packages, to enter into three Special Forbearance agreements, and told Plaintiffs that Defendants' primary goal was helping the Plaintiffs keep their home.

///

164.    Once in default and in modification negotiations with the Defendants, Plaintiffs were unable to resolve their default, make any payments, or avoid decimating their credit.

165.    Defendants put Plaintiffs in a position where they were at the mercy of Defendants' good faith, fair dealing, and honesty.

166.    Defendants knew the truth, but concealed the truth from Plaintiffs, including but not limited to, the following truths:

a.    Defendants allowed unauthorized signatures on the foreclosure documents, placed or acquiesced in the placement of false information on those documents, including documents required to be recorded at the county recorder's office to initiate and schedule the foreclosure, resulting in the noticing and conducting of a void trustee's sale;

b.    Defendants did not have adequate and competent staff to timely and properly process their loan modification packages;

c.    Defendants would fail to follow through on written, verbal and implied promises, including without limitation the promise that their "primary goal" was for Plaintiffs to keep their home, as claimed in ASC's letter of July 13, 2010 (*See* Exhibit "O"), which was clearly false since they foreclosed pursuant to invalid documents; their primary goal was to take the home;

d.    Defendants would fail to follow through on contractual obligations, including without limitation, their obligation to release the security instrument if all sums due were paid, and to initiate, and conduct any trustee's sale with authorized signatures and otherwise valid documents;

e.    Defendants intended to foreclose during negotiations, with little or no notice to Plaintiffs, to prevent them from exercising their legal right to seek an injunction;

f.    Defendants were participating in a system of loan documentation, securitization, processing, and servicing, which hid from the Plaintiffs, the identity of the

Note Holder, and the lender/creditor, sells the note to unknown entities with no way for Plaintiffs to track the transactions, and hides the beneficiary of the deed of trust, supported by a continuing campaign of concealment on the part of all Defendants, to keep this critical loan information from the borrowers.

167.    Defendants prevented Plaintiffs from learning any of these truths, by falsifying the documents to make them look legitimate including recording them at the county recorder's office, setting up a telephone system which assures that Plaintiffs and their agents would never speak to the same person twice; by offering a loan modification program when Defendants knew they were not equipped to properly administer it; participating in the MERS system which affirmatively conceals the location of the note, identity of the Note Holder, the true beneficiary under the deed of trust, and the number of sales of the loan, and when and to whom the sales were made; by participating in the mortgage-backed securities market which by its nature conceals the true investors, creditors, Note Holder, and DOT beneficiary; and other actions to conceal.

168.    As a result of Defendants' fraudulent concealment, Plaintiffs have suffered pecuniary loss.

**COUNT SEVEN**

**<u>FRAUD</u>**
**(ALL DEFENDANTS)**

169.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

170.    In signing and recording the Substitution, or instructing others to sign and record the Substitution, which represented that Chet Sconyers was an authorized signatory of MERS, and that his signature was made in Tarrant County, Texas, even though MERS' state of residence is Delaware, and principal place of business is in Virginia, the

Defendants made false representations to Plaintiffs.  In representing that ASC was the beneficiary under the DOT, when all Defendants knew that it was not, the Defendants made false representations to Plaintiffs.

171.   In signing and recording, or instructing the signing and recording of the NTS, which represented that Joe Bueno with FATICO signed in Orange County, California, when FATICO is located in Forth Worth, Texas, FATICO, the Defendants made false representations to Plaintiffs.  In stating, in the NTS, that ASC was the beneficiary when all Defendants knew it was not, Defendants made false representations to Plaintiffs.

172.   In signing and recording, or instructing others to sign and record the Assignment, which represented that Deeann Gregory was an authorized signatory of MERS, and that her signature was made in Tarrant County, Texas, even though MERS' state of residence is Delaware and its principal place of business is Virginia, the Defendants made false representations to Plaintiffs.

173.   In proceeding to trustee's sale, and foreclosing on Plaintiffs pursuant to the above fraudulent documents, and signing and recording a Trustee's Deed Upon Sale which states that the purported creditor, US Bank as Trustee, purchased the property at sale for $246,500.00 cash, the Defendants made false representations to Plaintiffs.

174.   All Defendants knew that the representations made in the foreclosure documents, as set forth above, were false, were unaware of whether they were true or not, or believed them to be true, and subsequently learned they were false.

175.   All of these representations were material, and they all were necessary elements in the foreclosure documents, without which, the Defendants could not have foreclosed.

///

///

176.   The Defendants intended Plaintiffs to rely on their representations, and therefore take no other action to protect themselves from foreclosure pursuant to void and fraudulent documents.

177.   Plaintiffs were not aware that the representations in the documents were false, and they were never notified by Defendants that any representations made by them were later determined to be false.

178.   Plaintiffs relied on the truthfulness of the representations, believed that the documents were valid, and failed to hire an attorney to protect their interests and seek a temporary restraining order and preliminary injunction related to the trustee's sale, prior to sale.

179.   Plaintiffs had a right to rely on Defendants' representations, having no reason to know or suspect that the Defendants would behave fraudulently with respect to the Property and their duties pursuant to the law and the contracts.

180.   As a result, Plaintiffs suffered damages.

181.   Defendants' actions were with malice, ill will, and a wonton disregard for the rights of the Plaintiffs.  Plaintiffs are entitled to punitive damages from the Defendants.

**COUNT EIGHT**

**CONSUMER FRAUD**
**(ALL DEFENDANTS)**

182.   Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

183.   Pursuant to A.R.S. § 44-1521 et seq., the Defendants have engaged in consumer fraud.

184.   The Defendants use deception, false promises, misrepresentations, concealment, and suppression or omission of material facts, when they engage in the

pattern and practice of allowing documents to be signed by individuals without legal authority, allowing those false documents to be recorded at the Maricopa County Recorder's Office, and proceeding with trustee's sales pursuant to void documents, in violation of Arizona law.

185.    In signing and recording the Substitution, or instructing others to sign and record the Substitution, which represented that Chet Sconyers was an authorized signatory of MERS, and that his signature was made in Tarrant County, Texas, even though MERS' state of residence is Delaware, and principal place of business is in Virginia, the Defendants made false representations to Plaintiffs.  In representing that ASC was the beneficiary under the DOT, when all Defendants knew that it was not, the Defendants made false representations to Plaintiffs.

186.    In signing and recording, or instructing the signing and recording of the NTS, which represented that Joe Bueno with FATICO signed in Orange County, California, when FATICO is located in Forth Worth, Texas, FATICO, the Defendants made false representations to Plaintiffs.  In stating, in the NTS, that ASC was the beneficiary when all Defendants knew it was not, Defendants made false representations to Plaintiffs.

187.    In signing and recording, or instructing others to sign and record the Assignment, which represented that Deeann Gregory was an authorized signatory of MERS, and that her signature was made in Tarrant County, Texas, even though MERS' state of residence is Delaware and its principal place of business is Virginia, the Defendants made false representations to Plaintiffs.

188.    In proceeding to trustee's sale, and foreclosing on Plaintiffs pursuant to the above fraudulent documents, and signing and recording a Trustee's Deed Upon Sale which states that the purported creditor, US Bank as Trustee, purchased the property at sale for $246,500.00 cash, the Defendants made false representations to Plaintiffs.

189.    The Defendants willingly participate in a system of loan documentation, securitization, processing, and servicing, which hides from the borrower both the identity of the Note Holder and the beneficiary of the deed of trust, supported by a continuing refusal on the part of all interested parties, to provide any information regarding these issues, to the borrowers.

190.    This deception, these false promises and misrepresentations, concealment, and suppression or omission of material facts, were made in connection with the sale of merchandise, the definition of which includes real estate.

191.    Defendants engaged in this course of conduct with the intent that Plaintiffs would rely on their false promises, deception, misrepresentations and concealment, fail to take any action to protect themselves from a fraudulent foreclosure, and ultimately lose their Property in foreclosure.

192.    As a consequence, Plaintiffs suffered damages and injury, for the loss of their home, damage to credit, attorney's fees and costs, and other damage.

193.    Plaintiffs are entitled to punitive damages against all Defendants for their wanton and reckless conduct which shows spite and ill will, and demonstrates a reckless indifference to Plaintiffs' interests.

## COUNT NINE

## NEGLIGENCE PER SE
### (ALL DEFENDANTS)

194.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

195.    In allowing, acquiescing in, or sending documents to be recorded at the County Recorder, which contained false and unauthorized signatures and information, the Defendants violated A.R.S. § 39-161.

///

196.    In recording false documents at the County Recorder's Office claiming an interest in the Property, the Defendants violated A.R.S. § 33-420.

197.    In allowing documents to be notarized by notaries who did not witness the signature, or confirm authority, the Defendants violated A.R.S. § 41-312 and § 41-313.

198.    Acts in violation of these statutes constitute negligence per se.  Violation of A.R.S. § 39-161 is a Class 6 felony.

199.    Plaintiffs suffered and will suffer damages due to the negligence per se of the Defendants, in the form of accrual of attorney's fees, costs, foreclosure of the Property, and other damages.

**COUNT TEN**

**<u>TEMPORARY RESTRAINING ORDER; PRELIMINARY INJUNCTION; PERMANENT INJUNCTION</u>**
**(ASC, US BANK, FATICO)**

200.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

201.    If Arizona were a judicial foreclosure state, the issue of the burden of proof would be on the party seeking affirmative relief, the Lender.

202.    The purpose of the non-judicial foreclosure statutes is judicial economy. But those statutes are now allowing the lenders and their business associates who failed to properly document matters in their rush to profit, take homes from the citizens of this State, without proving standing, the identity of the Note Holder, the Lender, the beneficiary, entitlement to payment, or appropriate documentation to proceed.

203.    Plaintiffs are bringing this cause of action to rescind the illegal and improper sale of their Property, and this cause of action is intended to be an express denial of the

Defendants' claims against the Property.  Plaintiffs deny that Defendants are the "Lender" or "Note Holder" and deny that Plaintiffs owe any of the Defendants any obligation of payment, without strict proof thereof.

204.   Defendants have improperly sold the Property using tactics and procedures that do not comply with Arizona law, and without standing or legal authority to do so, as set forth in detail in the factual section and in the claims asserted above.

205.   Plaintiffs request that this Court not allow the Defendants to take any further action related to this Property until a full hearing on the asserted claims have been heard, and evidence as to the Defendants' standing to foreclose as the Note Holder and beneficiary, has been presented.

206.   Plaintiffs will suffer immediate and irreparable injury, harm, loss and damage if the Trustee's Deed is allowed to stand, and the Defendants are allowed to proceed with a forcible detainer action or other action pursuant to the illegal and improper sale which took place on January 11, 2011.

207.   On information and belief, the Note has been destroyed, and if not, sold many times, and now is allegedly in a securitized mortgage pool.  As set forth above, Plaintiffs have been given conflicting information from the various Defendants regarding the identity of the entity entitled to enforce the Note.

208.   If the Note is in the securitized mortgage pool, the real holders of the Note may be the investors in the mortgage pool.

209.   Because of the default on this loan in 2008, there likely also exists evidence that the Note has already been paid off by credit default swaps purchased by the mortgage pool, or by insurance coverage purchased against the risk of loan defaults in the securitized pool, or otherwise.  In that event, any real party in interest may be an insurance company with a subrogation claim, but none of the Defendants herein.  Alternatively, the Note was transferred out of the Trust upon default, pursuant to Trust requirements.

WHEREFORE, Plaintiffs requests the following relief:

1. For a Declaration and Order that the Assignment of the Deed of Trust from MERS to US Bank as Trustee be declared null and void, of no force and effect, and in violation of Arizona law;

2. For a Declaration and Order that the Substitution of Trustee is null and void, of no force and effect, and in violation of Arizona law;

3. For a Declaration and Order that the Notice of Trustee's Sales is declared null and void, of no force and effect, and in violation of Arizona law;

4. For a Declaration and Order that the Trustee's Sale which took place on January 11, 2011, is rescinded, and that the Trustee's Deed recorded on January 24, 2011 is void and of no force and effect;

5. That documentation pursuant to these Declarations be recorded at the Maricopa County Recorder's Office immediately, and that a Trustee's Sale not again be rescheduled on the Property unless Plaintiffs loses on the merits of all their claims;

6. For a Declaration and Order that each of the Defendants must prove that it is the Note Holder and beneficiary both, before seeking to foreclose pursuant to the Loan Documents;

7. For a Declaration and Order that because the Note and DOT, which are inseparable to be enforceable, have been consensually separated since the inception of this loan, that the Note has been rendered unsecured, and the DOT is of no force and effect, and ordering that title to the Property is quieted in favor of Plaintiffs;

8. For damages sustained by the Plaintiffs as a result of the negligence and/or intentional conduct of the Defendants, or otherwise, as allowed by law;

9. For damages sustained by the Plaintiffs as a result of the Defendants' engaging in consumer fraud;

///

10.     For punitive damages to deter the Defendants and punish them for the torts they have engaged in at Plaintiffs' expense;

11.     For judgment for Plaintiffs' legal fees and costs incurred, pursuant to ARS § 12-341.01, as this matter arises out of a contract;

12.     For interest on the reasonable attorney's fees, court costs, and other costs of collection at the highest legal rate from the date of entry of judgment herein until paid in full; and

13.     For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as a matter of right.


DATED this 5th day of August, 2011.

                    BARBARA J. FORDE, PLC



                    /s/ Barbara J. Forde
                    Barbara J. Forde, Esq.
                    20247 N. 86th Street
                    Scottsdale, AZ  85255
                    Attorney for Plaintiffs

I hereby certify that on August 5, 2011,
I electronically transmitted this document
to the Clerk's office using the CM/ECF
System for filing and transmittal of a
Notice of Electronic Filing to the following
CM/ECF Registrants:

Gregory J. Marshall
Daniel W. Huitink
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004

*Attorneys for Defendants America's Servicing Company, US Bank National Association, as Trustee for CSMC Mortgage-Back Pass-Through Certificates, Series 2006-2, Mortgage Electronic Registration Systems, Inc.*

Matthew D. Bedwell
GUST ROSENFELD
One E. Washington, Ste 1600
Phoenix, AZ  85004

*Attorney for First American Title Ins. Co.*


____/s/ Barbara J. Forde_____

1

## VERIFICATION

2

3        I declare under penalty of perjury that the foregoing First Amended Complaint is true and

4    correct to the best of my knowledge, information, and belief.

5

6        Executed this 5th day of August, 2011.

7

8        _____

9        Marcus Silving

10

11       _____
         Deborah Bader

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26